UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | Case No.: 3:17CR164(JBA) |
|---|---|---|
| v. | : | |
| RAMIL MANSOUROV | : | December 26, 2018 |

DEFENDANT RAMIL MANSOUROV'S
MEMORANDUM IN AID OF SENTENCING

Defendant Ramil Mansourov, by and through counsel, Miles Gerety, respectfully submits this Memorandum in Aid of Sentencing. Under a plea agreement, Dr. Mansourov has pleaded guilty to healthcare fraud in violation of 18 U.S.C. § 1347 and money laundering n violation of 18 U.S.C. § 1956(a)(1)(B)(i). He has admitted defrauding Connecticut's Medicare program of over $4 million and laundering the proceeds of that fraud. The defendant does not seek to minimize the scope of the fraud he committed but to explain the downward spiral that led to this conduct.

This memorandum is written to aid the Court in crafting a sentence "sufficient, but not greater than necessary" to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The defendant recognizes that the serious nature of his offenses requires the Court to impose a significant period of incarceration upon him but hopes that the Court, in weighing the defendant's personal history and characteristics against his offenses, will determine that a below Guidelines sentence is appropriate and just.

Dr. Mansourov overcame significant hurdles to become a medical doctor and has honorably served his adopted country in the United States Air Force.

Educational achievements

Dr. Mansourov overcame one the most horrific childhood traumas imaginable to become a physician: the suicide of his mother when he was just thirteen years old.[1] Despite that tragedy, Dr. Mansourov completed high school in Russia with honors, served in the Russian Navy, attended Kazan Medical University, and emigrated alone to the United States at 22. He then attended and graduated from Hunter College in New York City and graduated from Ross Medical School at 28. In July 2002 at the age of 32, Dr. Mansourov completed the Family Medicine Residency Program at Stamford Hospital. Dr. Mansourov was board certified in Family Medicine in 2003.

Service in the U.S. Air Force

Upon graduation from the Family Medicine Residency Program in 2002, Dr. Mansourov enlisted in the United States Air Force. He completed commissioned officer training at Maxwell Air Force Base in Montgomery, Alabama. Dr. Mansourov was then stationed at Grand Forks Air Force Base in Grand Forks, North Dakota where he served as a flight surgeon.

After the grounding of the Space Shuttle fleet following the loss of the Columbia in February 2003, the rotation of NASA astronauts serving on the International Space Station was done on Russian Soyuz spacecraft flown from Kazakhstan in central Asia. Dr. Mansourov volunteered and was assigned to a Critical Care Air Evacuation Team supporting NASA astronauts returning from space. He was decorated for that service.

---

[1] Dr. Mansourov recalls being only 13 at the time of his mother's suicide 1983. Milausha Bagautdinova, the elder sister who cared for him after their mother's death, in her letter of support says her brother was 14. The defendant believes that this discrepancy is because the he lived with another relative for six months after his mother's death and that he had turned 14 before his sister took custody of Ramil.

After Dr. Mansourov received his honorable discharge from the United States Air Force in 2005, Dr. Mansourov joined the Air Force Reserve. He was called up for active duty in 2009. He remained in the Air Force Reserve until 2013, retiring as a major.

From 2010 to 2012, Dr. Mansourov worked as an attending physician in the Emergency Department of the Fargo VA Health Care System.

<u>The suicide of young Ramil's mother, an unaddressed childhood trauma</u>

> Unfortunately, in 1983 when Ramil was fourteen years old, our mother took her own life. The details of her suicide are quite difficult to understand. She hung herself while alone in the apartment with Ramil. My poor brother found her lifeless body hanging from the ceiling and lost consciousness. We don't know how long he lay unconscious in the same room with our dead mother hanging above him. But after regaining consciousness he came out of the apartment to look for help from the neighbors in the building. Later, the neighbors told me that they have never heard such a desperate scream as they did that day. [Letter from Milausha Bagautdinova, Ramil Mansourov's sister, eight years his senior. ]

At the time of his mother's suicide, Ramil and his mother were living alone in a small apartment building in Kazan, Russia — a city 444 miles east of Moscow. The parents' marriage had all but ended. Ramil's sister Milausha had married and started her own family. Ramil's father, a successful journalist with an outsized personality, was seldom home. To others, the father was a charming and successful man. Within the family, the story was different. Ramil's father was a womanizer and an alcoholic who sometimes beat Ramil's mother in drunken rages. Thus, even before his mother's suicide, Ramil's childhood was not a happy one.

Few childhood traumas are as devastating to a young teen as a parent's suicide. In fact, such suicides are so traumatic they not only affect the lives of the children of suicide victims but are passed on to their children.[2] While all parental suicides are likely

---

[2] "Parent suicide: pathways of effects into the third generation," *Psychiatry*, 2006 Fall; 69(3):204-27.

to have devastating consequences for a child, the loss of one's mother is the most devastating of all.[3]

For Ramil, the psychological devastation of his mother's suicide was heightened by the fact that his mother committed suicide in his room's doorway, using a pull-up bar that he had put up over her objections, while he and his mother were alone in their apartment. Ramil was left blaming himself for his mother's suicide, a common reaction among survivors, especially teenagers. He came to believe that his mother had not wanted that pull-up bar because she knew she might use it to hang herself. He was haunted that as he was enjoying a favorite television show his mother quietly took her own life — haunted that he didn't see her desperation. Ramil would suffer recurrent flashbacks and nightmares throughout his childhood. (Those flashbacks would return later in life during his service in the Air Force.)

Ramil was left to deal with his grief on his own. His sister Milausha writes, "in [the] Soviet Union in 1983 depression simply was not recognized as a health condition, and going to see a psychiatrist was considered to be something shameful. Ramil most likely suffered major psychological trauma from finding our mother dead in the apartment without any other adults around to help. For a long time, he had trouble getting out of bed or showing positive emotions. It took me more than three years to recover from my mother's death, and I was an adult at the time she committed suicide."

As devastating as the suicide of his mother was, this is not to suggest that this childhood trauma in any way justifies Dr. Mansourov's fraud and money laundering. Instead, it is merely to suggest that the loss of his mother through suicide produced a

---

[3] *Lancet Psychiatry*, 2014; 1: 86–94, 89.

4

certain vulnerability that would set Dr. Mansourov into a tailspin when his second marriage disintegrated.

Alcoholism and sobriety

Simply having a parent who is an alcoholic increases a child's risk of alcoholism two to four-fold. Predisposition to alcoholism, long know to run in families, is now known to have both genetic and environmental risk factors.[4] "In addition, offspring of alcoholics drink earlier, are more likely to develop alcohol use problems, progress from initial alcohol use to alcohol use disorder more quickly, and are less likely to mature out of moderate to heavy drinking."[5] Exposure to domestic violence alone puts children at increased risk of developing a substance abuse problem and a myriad of other psychosocial adjustment problems.[6] The combination of his father's alcoholism and domestic violence, coupled with the trauma of his mother's suicide, all increased Ramil's susceptibility to developing a substance abuse problem. Thus, it can come as no surprise that Dr, Mansourov developed a serious drinking problem in his late teens.

By 17, Ramil was drinking. By 18 his drinking had become a problem. Ramil drank heavily throughout college and medical school. During his last year of medical school, a faculty advisor confronted Ramil about his drinking with the warning that his drinking was out of control and needed to stop. Ramil, then 28, took that advice and immediately joined Alcoholics Anonymous. With the help of AA Ramil was able to stay

---

[4] "The genetics of alcoholism: identifying specific genes through family studies," *Addiction Biology.* 2006 Sep;11(3-4):386-96.

[5] "Alcoholism and Intimate Partner Violence: Effects on Children's Psychosocial Adjustment," Int J *Environ Res Public Health.* 2009 Dec; 6(12): 3156–3168.

[6] *Id*.

sober for over a decade. But his drinking did come with a price, it destroyed his first marriage. He had married at 21 or 22. The marriage only lasted five years.

Second marriage and parenthood

In July 1999, Dr. Mansourov married for the second time. His second wife, Goulnara Mansourov, had been a close friend of his sister Milausha Bagautdinova. From 2002, when Dr. Mansourov was stationed in at Grand Forks Air Force Base and for a time after his discharge from active duty the Air Force in 2005, the couple lived in North Dakota. The couple had two children, Jasmine who is now 14 and Maya who is 12. Dr. Mansourov reports that his marriage seemed solid while the couple lived in North Dakota.

By all accounts, Dr. Mansourov was, and is, a devoted and loving father.

Dr. Mansourov's niece Aygul Charles, an immigration lawyer in New York City, in her letter of support writes that she and her husband spent many weekends with Ramil and his daughters. She describes a close and loving relationship between the girls and their father; "I was always impressed about how much he knew about their daily troubles and concerns in school and with friends, no matter how small."

Ms. Charles's husband, Michael Dowell, a submarine officer and a lieutenant commander in the United States Naval Reserve, also writes of spending many weekends with Dr. Mansourov and his daughters when he and Aygul were together. (The couple is presently going through a divorce.) "From my observation, Ramil has been nothing but a loving and caring father to his girls." He adds, "I was particularly struck by the attention Ramil gave to his daughters and the time he prioritized out of his schedule to attend their music recitals, sports events, and fun activities."

Alexandra Chukhareva, a high school physics teacher in Uniondale, New York knew Dr. Mansourov and his daughters through her friends Aygul Charles and Michael Dowell, writes in her letter of support: "I met Ramil on multiple occasions whenever he came to New York to spend time with Aygul. Some of those times he came with his two daughters. Jasmine and Maya. During those occasions I observed Ramil to be a caring father to his two daughter[s] and a caring uncle to Aygul."

Iskander Bagautdinov, Ramil's nephew, writes in his letter of support, "Ramil has always been a dedicated and loving father to his two children, Maya and Jasmine. Since their birth, he has always put his children before himself, making time for their trips, education and extracurricular activities. He went through a hard and messy divorce with their mother, involving a ton of legal troubles. In my opinion, he did his best to shield his children from the messy legal process and did his best to give them a good life during his half of custody time. I admired his dedication to his children and found his to be an extremely loyal and loving father."

<u>Collapse of the marriage and Dr. Mansourov's downward spiral</u>

In 2012, Dr. Mansourov purchased Immediate Health Care from Dr. Patel. He changed the practice's name to Family Health Urgent Care. Dr. Patel continued to work at the clinic as an employee. Dr. Mansourov worked at the clinic but also worked as a locum tenens physician out of state to generate extra income. For a time Goulnara Mansourov worked on the clinic staff as well. But the same year he purchased the clinic, Dr. Mansourov's marriage, which had been turbulent, began to fall apart.

In late 2012, Mrs. Mansourov told her husband that she wanted a divorce. Dr. Mansourov moved out of the marital home in the Tokeneke section of Darien and rented

a townhouse. Mrs. Mansourov filed a complaint for dissolution of marriage on January 31, 2013. While a judgment of dissolution was entered on October 1, 2014, the couple spent years in contentious litigation, racking up legal bills in the hundreds of thousands of dollars, which Dr. Mansourov was responsible for paying.  The divorce left Dr. Mansourov emotionally unhinged.

In 2013, as Dr. Mansourov tried to manage the clinic and worked extra jobs as a locum tenens physician to keep the clinic and himself solvent.

In 2014, facing mounting legal bills, and the burden of making very substantial alimony and support payments, Dr. Mansourov began fraudulently billing Medicaid.

In July of 2015, just one month shy of 17 years of sobriety, Dr. Mansourov started drinking again.  Confronted by investigators for the Connecticut Department of Social Services (DSS) regarding approximately $900,000 in dubious billings, Dr. Mansourov accelerated his fraudulent billing knowing full well that Connecticut DSS was now scrutinizing his billing.   He recklessly submitted false Medicaid bills with less and less effort to make them seem legitimate.[7] He traveled widely, gave a new girlfriend lavish gifts and financed her divorce and child custody fight.    His behavior was both self-indulgent and self-destructive.  Dr. Mansourov knew that he would be caught.

The Guidelines calculation

The defendant and government agree that Dr. Mansourov's base offense level under U.S.S.G. § 2Bl.1(a)(2) is 6 points. Because the loss exceeds $3,500,000, an additional 18 must be added under U.S.S.G. § 2Bl.1(b)(1)(J).  A further two points are

---

[7] In a meeting with Counsel and counsel's investigator and members of the Connecticut Attorney General's healthcare fraud unit, Assistant Attorney General Rick Porter described just how blatant and obvious the fraud had become giving the example of fraudulent bills submitted on a particular Thursday.  Counsel quipped that it sounded like Dr. Mansourov must have been drunk at the time.  Little did we know that this was probably the case.

8

added under U.S.S.G. §2B 1.1(b)(7) because the fraud victim was a government healthcare program with a loss greater than $500,000. Two more are added under U.S.S.G. §2S 1.1 (b)(2)(B), because Dr. Mansourov was convicted for a violation of 18 U.S.C. § 1956, and another two under U.S.S.G. §3B 1.3 because the crime involved use of a special skill.

Both parties agree that Dr. Mansourov's lack of a criminal record places him within Criminal History Category I.

The government asserts an additional two points should be added under U.S.S.G. §2S1.1 on the grounds that money laundering offense qualifies as sophisticated one. The defendant believes that it does not.

The government also asserts that Dr. Mansourov's flight was such that an additional two points should be added under U.S.S.G. §3C1.1 for obstruction of justice. The defendant believes that the flight in question does not rise to the level justifying the addition of an additional two points for obstruction. Under the Government's calculation, the defendant's adjusted offense level is 34. Under the defense calculation, Dr. Mansourov's adjusted offense level is 30. Subtracting three points for acceptance of responsibility, the government calculates a final offense level of 31 and defense 27.

The defendant believes that, while he is guilty of money laundering, his methods were not particularly sophisticated. The commentary for §2S1.1 reads:

> Sophisticated Laundering under Subsection (b)(3).—For purposes of subsection (b)(3), "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense. [Guidelines Manual (November 1, 2018) at 317.]

No shell companies, foreign trusts or offshore corporations were used by Dr. Mansourov. Funds were not placed in the names of fictitious persons or straw men and

then redeposited in the defendant's name. As is now acknowledged on page 2 of the addendum to the PSR, Dr. Mansourov deposited a mere $1,053.00 to a bank account in Switzerland. While the Guidelines do note that sophisticated money laundering typically involves offshore accounts, the defendant does not believe that such a small sum is what the authors of the commentary had in mind. *Id*. at 318.

The defendant further believes that the government is misapplying U.S.S.G. §3C1.1. In the commentary to U.S.S.G. §3C1.1, Obstructing or Impeding the Administration of Justice, "Examples of Conduct Ordinarily Not Covered" provides in pertinent part:

> (D) avoiding or fleeing from arrest (see, however, §3C1.2 (Reckless Endangerment During Flight))  [Guidelines Manual (November 1, 2018) at 360-61.]

The defendant acknowledges that, while working at a hospital Holton, Maine and learning in a phone call from a police officer in Connecticut that he should return to the state because federal authorities were looking for him and had searched his home, Dr. Mansourov panicked and fled to Canada. (The town of Holton, Maine is on the Canadian border.) Dr. Mansourov, who is a dual US and Russian citizen, also acknowledges that he bought a ticket to Moscow on a flight that rather incredibly first stopped at JFK and even tried to run from a Canadian officer who ended up tackling Dr. Mansourov.

The defendant submits that his panicked and desperate attempt to flee arrest simply does not rise to the level of obstruction needed to apply U.S.S.G. §3C1.1. In *U.S. v. Bliss*, 430 F.3d 640 (2d Cir. 2005), a defendant who learned that authorities had executed a search warrant at his home in Vermont fled to California where he lived for over a year. The court in Bliss ruled that to apply U.S.S.G. §3C1.1 required more than

flight but actual acts of obstruction. Id. at 361.    See also *U.S. v. Stroud*, 893 F.2d 504 (1990).

It should be noted that nothing Dr. Mansourov did in connection with his flight to Canada and attempted flight to Moscow (albeit via JFK in New York) caused the government any significant expenditure.  Moreover, rather than fighting extradition or deportation to the United States, Dr. Mansourov waived his rights in a Canadian court and agreed to be returned to the United States thus avoiding what could have been significant delays in his prosecution.

<u>Defendants objections to PSR</u>

The defendant has made a number of objections to claims made in the PSR. Those objections are contained in an addendum to that report.  In essence, the defendant's objections come down to one central claim:  Dr. Mansourov vigorously rejects the claim that he knew of, or participated in, Dr. Patel's selling opioid prescriptions to patients for cash.

Dr. Mansourov did believe that Dr. Patel's approach to prescribing opioids was different from his own.  Doctors who completed medical school in the late 1990s and began practicing as board-certified physicians in the 2000s learned to take a more cautious approach to prescribing opiates, although they were taught that pain should seldom be left untreated and little, if anything,  about the addictive nature of opiates. Physicians of Dr. Patel's generation were taught nothing about the addictive nature of prescription opiates and nothing about addiction itself.  To the contrary, his generation of doctors were taught that compassionate medical care required doctors to offer

11

treatment to relieve patients' pain, especially patients suffering from chronic pain, and that opiates were the best medicine for doing so and not habit forming for most patients.

With the rise of drug addiction among working and middle-class Americans, there has been a paradigm shift in views towards the treatment of chronic pain. While popular opinion may now view prescribing opiates as always suspect, most physicians treating patients with chronic pain know that the best approach is to prescribe opiates with care — but to prescribe them nonetheless. Failure to treat patient's with chronic pain is, in the view of many modern physicians, to simply abandon such patients who, besides losing faith in the medical profession, will often turn to street drugs and/or alcohol.

Every family practitioner who treats Medicaid patients sees a good number of patients suffering from chronic pain. The notion that one can send such patients to pain specialists is simply false. No pain medicine specialist in Norwalk, Stamford or Bridgeport, Connecticut accepts Medicaid patients. In fact, only two pain specialists in Fairfield County — Dr, Steven J. Bennett in Greenwich and Dr.Antonio Paz in Brookfield — accept Medicaid patients. [8]

The government's sentencing memorandum in USA v. Bharat Patel dated October 3, 2018 details Dr. Patel's exchange of opiate prescriptions for cash passed to Dr. Patel in envelopes from five confidential sources identified only as CS #1, CS#2, CS #3, CS #4 and CS #5. The memorandum also quotes a patient identified as VW accounting how much that patient had paid Dr. Patel from 2012 until Patel's arrest. It quotes a non-patient N telling how N paid patient D for prescriptions from Dr. Patel. CS

---

[8] These results are from a provider search for Fairfield County pain medicine specialists on the Husky Health Connecticut website's patient portal on December 23, 2018.

12

#3 is quoted as telling investigators that he or she believed that Doctor Patel was providing opiate prescriptions for cash 15 to 20 other patients. While 15 to 20 patients may sound like a large number, the clinic would often treat that many patients in a day. The clinic was open six-and-a-half days a week.

Dr. Feng Wang, a board-certified family medicine practitioner, joined the practice at Family Health Urgent Care in 2014 and continued to work at the clinic during the period covered in the Patel indictment. According to Dr. Wang, only one doctor was on duty at the clinic at a time. She occasionally saw patients who had previously been treated by Dr. Patel. Dr. Wang found that Dr. Patel kept adequate notes and that the medical records he kept documented patient conditions and provided a proper medical basis for the medicines he prescribed. She was completely unaware that he was selling opiate prescriptions for cash and does not believe Dr. Mansourov was aware either. Dr. Wang's letter of support for Dr. Mansourov is attached.

<u>Dr. Mansourov's loss goes well beyond the penalty this Court will impose</u>

For Ramil Mansourov, the two most important people in his life are his two daughters, Jasmine (14) and Maya (12). Since his arrest and detention, Dr. Mansourov has had no contact with his daughters. His divorce was bitter and Goulnara Mansourov has prevented the girls from speaking or corresponding with their father.

Making matters worse, Ms. Mansourov has also severed all contact between the girls and their maternal aunt Milausha Bagautdinova and their cousin Aygul Charles. Although Ms. Mansourov still lives in the New York metropolitan area, the children now live with Ms. Mansourov's elderly parents in Russia. The situation has been particularly

difficult for the two girls because neither spoke Russian when their mother sent them to live with her parents.

The complete loss of contact with his daughters has been heartbreaking for Dr. Mansourov. Counsel understands it has been equally heartbreaking for Jasmine and Maya. No punishment the Court can impose will be as devastating to Dr. Mansourov as the loss of all contact with Jasmine and Maya.[9]

Dr. Mansourov has expressed the hope of returning to medical practice after he has completed his sentence. However, the likelihood of Dr. Mansourov ever returning to practice in the United States is low. His conviction in the instant case will act as a permanent bar to his treating Medicare and Medicaid patients. Even if Dr. Mansourov were to somehow regain a medical license, he will never return to the life he once had. He faces a lifetime of debt.[10]

Reasons for a Below Guidelines Sentence

As the PSR points out, Dr. Mansourov has no previous record and has never before was incarcerated. In prison, he has used his time constructively. He is learning Spanish and Arabic and is quite fluent in both. He has joined the Spanish Club and started a Runners' Club. He helps young inmates write letters. He attends church and AA meetings.

---

[9] Through Ms. Mansourov's attorney, counsel has tried to arrange to reestablish contact between Dr. Mansourov and his daughters, Ms. Mansourov continues to refuse to allow such contact.

[10] In July 2017, the Connecticut Attorney General's Office filed a complaint against Dr. Mansourov in Hartford Superior Court under the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 - 4-289, for defrauding the Connecticut Medicaid program. STATE OF CONNECTICUT v. RAMIL MANSOUROV, Case No. HHD-CV-17-6080510-S. The State is seeking $4.9 million in restitution and treble damages. Having admitted to defrauding the Medicaid program in this Court and having pleaded guilty to that fraud, Dr. Mansourov has no defense against Connecticut's claim and faces a judgment in excess of $14 million, a judgment that cannot be discharged through bankruptcy.

The PSR notes in paragraph 133 that a downward departure may be warranted by §5H1.11 of the Guidelines. §5H1.11 provides, "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the Guidelines." Dr. Mansourov had a military career with the U.S. Air Force, which included active duty service and service in the Air Force Reserve and spanned over a decade. Service of this length does distinguish Dr. Mansourov from the typical defendant in a case of this nature.

The PSR also notes in paragraph 133 that, "the Court may wish to consider whether a sentence within the applicable Guidelines ranges is more than necessary to serve the purposes of sentencing for Dr. Mansourov who, until his arrest in the instant offense, has never served any time in prison."

The PSR suggests in paragraph 136 that Dr. Mansourov's long history of alcohol abuse makes him a good candidate for the Bureau of Prisons (BOP) Residential Drug Abuse Program (RDAP). Counsel and Dr. Mansourov have discussed participation in the Residential Drug Abuse Program (RDAP) and DR. Mansourov believes he could benefit from the program.

Given the obstacles Dr. Mansourov faced in life, especially the trauma he experienced with his mother's suicide, and the manner in which he overcame those obstacles to become a medical doctor, and given Dr. Mansourov's service to the country in the U.S. Air Force, counsel believes a substantial departure below the Guidelines is

appropriate and that such a sentence would be sufficient to accomplish the goals of sentencing.

Respectfully submitted,

The Defendant, Ramil Mansourov


By: _____/s/ Miles Gerety_____
Miles Gerety, His Attorney
Federal Bar No. ct 29380
135 Elm Street
Bridgeport, CT 06604
MilesGerety@Gmail.com
(203) 241-8984

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

                                          ___/s/ Miles Gerety___
                                          Miles Gerety