UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 3:17CR164(JBA) |
| | : | |
| v. | : | |
| | : | |
| RAMIL MANSOUROV | : | February 27, 2019 |

GOVERNMENT'S SENTENCING MEMORANDUM

Ramil Mansourov ("Mansourov" or "the defendant") stands before this court a convicted fraudster and a consummate liar. Using little more than a code and a computer, defendant and former medical practitioner defrauded Connecticut's Medicaid program of over $4,000,000 in a short two-year span, charging Medicaid for examinations at home, at his office and at nursing homes that never occurred. Having been caught, Mansourov seeks to place the onus of his crime on his ex-wife, claiming in interviews with Probation and through relatives that his most recent divorce led him into a "downward spiral." Doc. 106 at 7. Like his disproven false claim to Probation that he worked for the Houlton Regional Hospital in Houlton, Maine as a locum tenens emergency room physician in "24 hour shifts" immediately prior to his arrest, *see* PSR ¶ 103, Second Addendum to PSR at 2, Mansourov's attempt to saddle his ex-wife with the blame for his fraud is simply another charade. After all, Mansourov did not use the stolen Medicaid funds to pay his court-ordered child support, court-ordered alimony or to fund his daughters' respective CHET accounts. Rather, Mansourov used his ill-gotten Medicaid monies to pay over $349,000 worth of credit card bills, to pay over $510,000 to a former lover, over $245,000 to other women, and to pay over $177,000 in legal fees and bail bonds related not only to his divorce but to his arrest for stalking a former girlfriend. Second Addendum to PSR at 1. But most of all, Mansourov used the fraudulently obtained funds as his own subsidy: to pay for his car and to pay over $185,000 for luxury purchases

1

and travel. He transferred over $1,338,000 of the fraudulently obtained Medicaid monies to other bank accounts he controlled in an effort to hide the money from the Connecticut Attorney General's Office, including $1,053.00 to a Swiss bank account in his own name. He withdrew nearly $230,000 of the fraudulently obtained funds in cash, making repayment of any of the stolen funds next to impossible to mandate. In short, although he takes pains to blame other, Mansourov is the sole person responsible for his flagrant criminal acts.

The Government respectfully submits this sentencing memorandum in connection with the sentencing of Mansourov, which is scheduled for March 13, 2019 at 10:00 a.m. In light of Mansourov's egregious abuse of Medicaid, which has resulted in an enormous loss that Mansourov has made no attempt to repay, and his laundering of the stolen funds to ensure that the monies would be (1) hidden from his victim and (2) available to him when he escaped or, at worst, after he served any jail sentence, the Government respectfully requests a sentence within the advisory Guidelines range of 87 to 108 months' imprisonment.

<u>BACKGROUND</u>

**A. <u>Investigative Background</u>**

Ramil Mansourov purchased Immediate Family Care in Norwalk Connecticut from co-defendant Bharat Patel in 2012. After the practice was sold, it reopened under a new name, Family Health Urgent Care. Mansourov retained Patel as an employee, and expanded the practice to add another medical practitioner.

Mansourov held a Connecticut controlled substance practitioner registration, and a DEA registration that allowed him to administer, dispense, and prescribe controlled substances, but only for legitimate medical purposes in the usual course of professional medical practice. Mansourov

was a participating provider with Medicare and the Connecticut Medicaid Program, of which "Husky" is a part.

The Connecticut Office of the Attorney General ("OAG") initiated an investigation related to Mansourov's fraudulent Medicaid billing in March of 2016, when the Department of Public Health received a complaint from an anonymous citizen. Accordingly, the OAG reviewed Mansourov's billing claims dating back to 2013. The OAG determined that Mansourov billed dozens of patients for hundreds of doctor visits that he claims he conducted but never did. Over approximately three years, Mansourov received approximately $5 million from Connecticut's Department of Social Services (DSS) in Medicaid payouts, over $4 million of which the OAG determined was fraudulent. Mansourov billed fraudulently in several different manners, including: (1) billing for home visits that he never made; (2) billing for nursing home visits that he never made; (3) billing for office visits that never occurred; and (4) billing for visits that he claimed took place on dates on which he was actually out of the country or out-of-state. The following discusses examples each of these schemes in turn.

1. **Mansourov fraudulently billed for falsified home visits.**

Family Health Urgent Care billed approximately 235 home visits—the majority for visits to Mansourov—for one patient in a one-year period, despite the patient's recollection that he saw Mansourov only once or twice. Mansourov typically billed these occasions as sixty-minute home visits, with a paid amount of $190.46 each. Furthermore, on three dates on which Mansourov billed Medicaid for home visits for a patient, co-defendant Patel billed Medicaid for a twenty-five minute office visit with this same patient, at the rate of $64.99 for each visit. Neither Patel nor Mansourov actually saw the patient. Ultimately, Family Health Urgent Care obtained over approximately $40,000 in fraudulent Medicaid billing for this patient alone.

Mansourov noted in this patient's medical record that he assessed the patient for chronic pain syndrome. He prescribed one 10/325-milligram Percocet tablet as needed every six hours and recommended that the patient follow up in one day. The home visits never occurred in the first place, but even if they had actually occurred, DEA Investigators concluded that Mansourov's notes did not reflect those of a general practitioner or urgent care provider; rather, they reflected notes of a pain management specialist monitoring a patient with long-term chronic pain.

### 2. Mansourov fraudulently billed for falsified nursing home visits.

Mansourov billed Medicaid for nursing home visits that he never made to a former patient. While Mansourov had seen this patient approximately two times about two and one-half to three years prior to Mansourov's flight to Canada after an arrest warrant was issued for him, that patient had requested a new physician because Mansourov failed to appear for visits and did not respond to the patient's requests. Nonetheless, Mansourov continued to bill Medicaid for visits to this patient between November of 2013 and September of 2016. In fact, Mansourov billed more than 450 nursing home visits, coded at thirty-five minutes each, for $57.17 to $144.90 each. Ultimately, the total amount that Mansourov billed for nursing home visits with this patient exceeded $58,000. DEA Investigators concluded that Mansourov fraudulently billed Medicaid for numerous nursing home visits that never occurred.

### 3. Mansourov fraudulently billed for falsified office visits.

Mansourov billed Medicaid for office visits with a family of six that never occurred. This family had visited Family Health Urgent Care on no more than nine or ten occasions. However, Medicaid billing documents revealed more than 600 office visits, billed alternatively at twenty-five or forty minutes each, for this family. Altogether, Family Health Urgent Care obtained more than $100,000 in fraudulent Medicaid claims for this family alone.

**4. Mansourov fraudulently billed for travel dates.**

Mansourov billed Medicaid for visits that he claimed took place on dates on which he was actually traveling outside the United States or outside Connecticut. For example, Mansourov fraudulently billed Medicaid for one patient for visits on various dates between April of 2014 and August of 2016, during periods in which Mansourov was not even in the coutnry. Furthermore, he fraudulently billed Medicaid for the same patient for visits on various dates between February of 2014 and June of 2015, when Mansourov was, in fact, not in the State of Connecticut. Mansourov also fraudulently billed Medicaid for services to a different patient for dates between June of 2015 and July of 2015, when in fact Mansourov was traveling abroad.

**5. <u>Mansourov engaged in money laundering.</u>**

Mansourov transferred the money that Mansourov's LLC initially obtained from Medicare and Medicaid into various accounts, later re-distributing those fraudulently obtained monies again to various accounts and using the stolen proceeds for significant financial purchases. One eventual recipient of Mansourov's fraudulently obtained money—his former girlfriend described as "Money Recipient #1" below—informed the DEA that Mansourov also worked in a hospital's emergency room in Kentucky, where he made a large amount of money in a short period of time. Furthermore, this individual saw Mansourov's 2015 tax return, which showed an income of $500,000. Mansourov generously gave money to his former girlfriend; he provided some of the money to fund a plastic surgery medical business that she never opened. She received a check for $100,000 from him, as well as monthly rent checks—ranging from $1,000 to $12,000 or more—and the use of a Land Rover, which was registered in Mansourov's name. Mansourov wired money directly

into this individual's account. If she expressed unhappiness with him, Mansourov would send her more money that month to appease her. Finally, Mansourov told this individual that he would transfer the title of his Darien residence to her, but it does not appear that he ever did so.

Mansourov's total false Medicaid claims amounted to nearly $5 million. Between November 2013 and December 2016, Mansourov's LLC billed at least $5.2 million to Connecticut Medicaid. When DSS demanded electronic patient billing records, Family Health Urgent Care provided the DSS with documentation showing less than $400,000 in legitimate billing during the same period. Mansourov then fabricated records to DSS to support the bogus claims. In 2014 and 2016 alone, Mansourov billed Medicaid for $3,886,908.03 for home and office visits that never occurred. He billed an additional $144,368.68 in fraudulent claims for home visits in 2014. In addition, he falsely qualified himself and his two daughters[1] for Connecticut Medicaid. Connecticut Medicaid paid at least $13,000 in medical services provided to Mansourov and his daughters. From 2013 to the date he fled the United States, Mansourov's total Medicaid false claims amounted to $4,994.027.

A review of bank records for Mansourov and Family Health Urgent Care reveals that Mansourov used some funds that his LLC obtained from Medicaid as follows:

| Approximate Amount | Payee |
|---|---|
| $349,281.32 | Credit Cards/Banks |
| $130,000.00 | IRS |
| $15,750.00 | Employees |

---

[1] Mansourov applied to Connecticut Medicaid for coverage for himself and his two daughters under the Husky Program. Mansourov claimed, in his application, that his income was as low as negative $4,508 per month in order to qualify himself and his children for Medicaid. As discussed herein, Mansourov's actual income was between $300,000 to $500,000 per annum at the time.

| | |
|---|---|
| $245,738.21 | Other individuals |
| $157,088.48 | Luxury/Purchases/Travel |
| $2,361.84 | Dental |
| $177,985.60 | Legal & Bail Bonds |
| $18,750.00 | G.M. |
| $3,496.35 | Bharat Patel |
| $948,998.62 | Family Health Urgent Care |
| $414,190.00 | MONEY RECIPIENT #1 |
| $210,735.00 | Cash |
| $101,987.00 | Other |
| **$1,338,390.00** | **Ramil Mansourov:**<br>$236,390.00 – no account specified<br><br>$730,000.00 – USAA account ending -80112<br><br>$89,000.00 – Citibank account ending -5672 |

| | |
|---|---|
| | $283,000.00 – Keybank/First Niagara Bank ending -1474 |

Additionally, bank records reveal that Mansourov moved some of the stolen funds to a bank account in Switzerland. Once Mansourov moved the stolen Medicaid funds to his USAA (-80112), Citibank (-5672), and Keybank/First Niagara Bank (-1474) accounts, he again distributed the stolen funds in the following manner:

| USAA -80112 Payees | |
|---|---|
| $99,400.00 | MONEY RECIPIENT #1 |
| $10,250.00 | G.M. |
| $20,400.00 | Other Individuals |
| $1,175.76 | Family Health Urgent Care |
| $24,785.00 | Legal |
| $92,000.00 | Ramil Mansourov & Ramil Mansourov, LLC |

| Citibank -5672 Payees | |
|---|---|
| $5,466.59 | Travel in Italy |
| $15,000.00 | MONEY RECIPIENT #1 |
| $12,000.00 | Family Health Urgent Care |
| $27,000.00 | Ramil Mansourov & Ramil Mansourov, LLC |

| Keybank/First Niagara Bank -1474 Payees | |
|---|---|
| $25,086.86 | Luxury/Purchases/Travel |
| $19,675.00 | Cash |
| $1,000.00 | Legal |
| $29,887.74 | Loan Payment |
| $8,000.00 | MONEY RECIPIENT #1 |
| $3,396.00 | Other Individuals |
| $17,000.00 | Ramil Mansourov |
| $136,155.00 | Other |

Keybank payments show that Mansourov then used his account to pay mortgage payments for his Darien, Connecticut home.

### 6. The Attempt to Arrest Mansourov

On July 12, 2017, at approximately 8:00 a.m, armed with arrest and search warrants, DEA agents tried to arrest Mansourov at his home in Darien. While DEA agents executed the search warrant on Mansourov's home, a neighbor called Mansourov and told him about the DEA raid. At approximately 9:00 a.m., Mansourov placed a call to a person in Houlton, Maine and said that a family member had been in a horrific car accident. At 10:30 a.m., Mansourov drove to Canada,

claiming at the border, that he was entering for the day. He then sent a text to his office manager at

12:58 p.m., in which he stated:

> Maria, DEA has a warrant for my arrest. I will call you from prepaid phone soon. Just keep the clinic going. Parnas will go my shifts and use my malpractice. I will use as little as possible the Webster account. But with the news I need to tap for necessities. Keep the ship afloat, ok? Do billing through Wang. That will render Patel powerless Once the dust settles- I'll call you from random number. Stay strong for all the girls. We will be ok Thank you for your support and loyalty. Ramil

Mansourov then sent a text message to his girlfriend, Money Recipient #1 in the tables

above:

> Didn't want to tell you over the phone:
> I crossed the Canadian border at noon, driving through Quebec now. Stopped to eat- beautiful, everything in French :) Heading to Montreal, hopefully one step ahead of Feds. Should fly out to Paris tonight My lawyer will sort things, at least while waiting, I can make money in one of the oil-reach Arab countries Sucks, but its life I will always love you I believe everything I did was good for you. Don't regret a second shifting money from government to you :)
> Ramil

Through his debit card usage, the DEA tracked Mansourov to the Montreal Airport. The

DEA also discovered that he had bought a ticket to fly from Montreal to JFK and then onto

Moscow. Debit card purchases showed that he stayed the night at the Marriott Montreal.

On July 13, 2017, Mansourov's ex-girlfriend engaged in the following text message

exchange with Mansourov (MR#1 = Money Recipient #1; RM = Ramil Mansourov):

| | |
|---|---|
| MR#1: | Did you make it out of Canada? |
| RM: | Not yet- keep your fingers crossed. You will be the first to know :) |
| RM: | Doing it very unconventional way |
| RM: | Just in case I need to stay in touch |
| RM: | Poor Patel is in max security in Rhode Island |
| MR#1: | Wow, what is unconditional way? |
| RM: | I'll tell you afterwards |
| RM: | Before long I will be home  like nothing happened  Enjoy your time with J |

MR#1: Thanks  Boat? Scuba dive? New identity?  I can't think of anything else
        unconventional
RM:     I'll keep you guessing, once clear – I'll tell you haha

About that time, Canadian Customs and Immigration saw Mansourov outside the Montreal

Airport Marriott as he exited his Range Rover. When the officials approached him, Mansourov ran,

but he was tackled to the ground.

Mansourov was charged with entering Canada under false pretenses.  Mansourov refused

extradition, posing a defense that he was truthful when he entered Canada and had no idea about

the warrant.  Canadian authorities examined his unlocked iPhone which showed all the text

messages described above.  While awaiting a deportation hearing, Mansourov met twice with

representatives from the Russian Consulate in Montreal.  Between meetings with consulate

representatives, Mansourov delayed his hearing date by claiming that he had sprained his ankle

playing soccer with other detainees.

Ultimately, Mansourov was ordered deported to the country from which he had illegally

entered Canada.  Faced with detention until he was removed to the United States, Mansourov then

agreed to waive his right to appeal the immigration decision and was handed over to border agents

at the Vermont-Quebec border.  DEA agents then placed him under arrest.

**B.**    **Procedural Background**

On July 26, 2017, a Bridgeport Grand Jury filed a four-count indictment charging

Mansourov, with violations of Title 21, United States Code, Section 846 (Conspiracy to Distribute

Oxycodone and Hydrocodone), Title 18, United States Code, Section 1347 (Health Care Fraud),

and Title 18, United States Code, Section 1956(a)(1)(A)(i) & (B)(i)(Money Laundering).  On

September 17, 2018, Mansourov pleaded guilty to the Health Care Fraud and Money Laundering

counts.

Mansourov's's guilty plea was based on a plea agreement with the Government. In that plea agreement, the Government stated its position that Mansourov's total offense level was 31, whereas Mansourov disagreed, and stated that his total offense level was 27. The Government's calculation included an additional two points for sophisticated money laundering, pursuant to U.S.S.G. §2S1.1(b)(3), and an additional two points for obstruction of justice, pursuant to U.S.S.G. §3C1.1, both of which Mansourov challenges. The parties agreed that Mansourov had a criminal history category I, so under the Government's calculation, Mansourov's advisory guideline range was 108 to 135 months' imprisonment, while under Mansourov's calculation, his advisory guideline range was 70 to 87 months' imprisonment.

### C. The Presentence Report

The Probation Office has conducted a thorough presentence investigation and compiled a detailed Presentence Report ("PSR"). The PSR agrees with the Government's calculation of Mansourov's total offense level and his criminal history category. PSR ¶¶ 59, 63, 66. Accordingly, the PSR, too, calculates an advisory Guidelines range of 108 to 135 months. PSR ¶ 117.

### D. Sophisticated Money Laundering

Mansourov argues that because he only "deposited a mere $1,053 to a bank account in Switzerland," no adjustment for sophisticated money laundering is merited. Doc. 106 at 9-10. Mansourov ignores that the movement of health care fraud proceeds to his Swiss account was only one part of the sophisticated laundering that involved multiple layers of transfers. Indeed, Application Note 5 to U.S.S.G. §2S1.1 defines "sophisticated laundering" not only as involving "offshore financial accounts," which plainly occurred here, but alternatively as involving "the use of . . . (iii) two or more levels (i.e. layering) of transactions." As the tables above (A. 5) demonstrate, Mansourov did not simply use the stolen Medicaid funds to pay for a vacation or to

purchase luxury items.  Rather he moved the monies to other accounts – layers – and through those accounts into other accounts.  Thus, for example, the tables show that after receiving illicit Medicaid funds, Mansourov transferred $730,000 to his USAA account ending -80112.  From there, Mansourov transferred $92,000 to an LLC, specifically, Ramil Mansourov & Ramil Mansourov, LLC.  There can be little doubt that the LLC was owned and controlled by Mansourov.  Thus, Mansourov transferred money he stole from Medicaid through two layers to himself.

Nor can there be any doubt as to Mansourov's reasons for using multiple layers of transactions to launder the proceeds of his health care fraud.  The only reason for using such layering was to disguise the nature of the funds.  As Mansourov admits, he knew that the OAG was investigating his fraud.  His layering made it more difficult and time consuming for the OAG to use subpoenas or search warrants to uncover where Mansourov had stored his money, and thus, recover his fraudulently obtained funds on behalf of Connecticut Medicaid.

### E. Obstruction of Justice

Mansourov also challenges the PSR's addition of two points for his successful flight from prosecution after learning of the arrest warrant against him.  Mansourov suggests that "his panicked and desperate attempt to flee arrest does not rise to the level of obstruction needed to apply U.S.S.G. § 3C1.1."  Doc. 106 at 10.  Mansourov attempts to compare his flight to flight the Second Circuit found to be insufficient to qualify as obstruction of justice in *United States v. Bliss*, 430 F.3d 640, 648 (2d Cir. 2005).  But Mansourov's conduct was far more obstructive than simply running away to California as occurred in *Bliss*.  Once arrested in Canada, Mansourov presented a defense that he had no idea there was a warrant for his arrest when he entered Canada.  In other words, he lied to Canadian authorities.  Mansourov's texts to his girlfriend and office manager in which he discussed the DEA warrant as his reason for fleeing to Canada proved to Canadian

authorities what a storyteller Mansourov is.  But Mansourov's obstruction did not end with a lie to Canadian authorities in an attempt to escape justice in the United States.

Having failed at lying to Canadian authorities and while detained in Canada pending removal to the United States, Mansourov twice met with representatives of the Russian government in an attempt to ensure that he was extradited to Russia, and not the United States.  Mansourov's post-flight actions were far more than "simply disappear[ing] to avoid arrest." *Id.* at 648.   More accurately, those actions – to include false statement to Canadian authorities to avoid being returned to the country from which he arrived under false pretenses as well as the attempts to secure Russian government assistance in being extradited from Canada to Russia -- constitute affirmative evidence that Mansourov sought to "actually hinder[] or impede[] the investigation or prosecution of the offense" in a "calculated and deliberate" manner.  *Id.* at 649-51; *see also United States v. Donodeo*, 910 F.3d 886, 904 (6th Cir. 2018) (citing *Bliss* and determining that defendant's relocations overseas coupled with his cut off of communications with his family and ultimately his attorney constituted obstruction of justice pursuant to U.S.S.G. §3C1.1).

Mansourov nonetheless claims that he "waived his rights in a Canadian court and agreed to be returned to the United States," Doc. 106 at 11, thereby showing an intent to speed his prosecution, not hinder it.  Mansourov argument fails for two reasons.  *First*, Mansourov's "waiver" of extradition was only after a full hearing in which a Canadian immigration court determined that he had illegally entered Canada, and adjudicated that he be extradited.  Notably, prior to that court-determination, Mansourov had refused to be returned to the United States, and had demanded and received a full hearing.  Thus, his only waiver was that of his right to appeal the Canadian immigration court's determination that he had illegally entered Canada under false pretenses.  *Second*, Mansourov's decision to waive an appeal of the Canadian immigration court's

decision is hardly surprising as the waiver was in *his* interest. After all, had Mansourov pursued an appeal of the immigration court's decision, Mansourov would have remained incarcerated in Canada pending his appeal. That period of incarceration pending appeal would *not* have been credited toward the "significant period of incarceration," Doc. 106 at 1, he recognizes he will ultimately receive in this case. Thus, Mansourov's calculated decision to begin serving his United States federal sentence as quickly as possible is simply not a reason to conclude that his relinquishment of his appeal negated his obstruction of justice.

In any event, even if Mansourov's flight coupled with his false statements to Canadian authorities and attempts to use his Russian citizenship to achieve extradition to Russia do not qualify as obstruction of justice pursuant to U.S.S.G. § 3C1.1, there is another reason for applying the obstruction guideline. After all, Mansourov falsely told to the interviewing probation officer who wrote his PSR that he was employed by the Houlton Regional Hospital in Houlton, Maine as a locum tenens emergency room physician in "24 hour shifts" immediately prior to his arrest, *see* PSR ¶ 103. But after the probation officer's investigation, it was learned that Mansourov never worked there. Second Addendum to PSR at 2. As Mansourov's reason for being at the border is extremely relevant with regard to his guidelines and whether he obstructed justice, Mansourov's lie to the probation officer alone should qualify for the obstruction enhancement. *See* U.S.S.G. § 3C1.1, App. Note 4(H)("providing materially false information to a probation officer in respect to a presentence or other investigation for the court").

SENTENCING LAW

A. The Guidelines

Although the Sentencing Guidelines are no longer mandatory, the Guidelines must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a). *United States*

*v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Crosby*, 397 F.3d 103, 110 (2d Cir. 2005); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007) ("district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process"); *see also Gall v. United States*, 552 U.S. at 46 ("Although the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions") (footnote omitted); *see* 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines).

A sentencing court must fashion a sentence that is both procedurally and substantively reasonable by properly calculating the base offense level under the United States Sentencing Guidelines and adequately explaining its reasoning for handing down a particular sentence. *Gall v. United States*, 128 S. Ct. 586, 594 (2007) ("It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications"). Where, as here, a defendant seeks a diversion from the PSR, the court may hold an evidentiary hearing to rule on the dispute in order to ascertain the appropriate criminal history category and fashion a procedurally reasonable sentence. Fed. Crim. R. Proc. 32(i)(3)(B). At such a hearing, the sentencing court may factor in any information that sheds light on the defendant's history, background, behavior or characteristics. *Williams v. New York*, 337 U.S. 241, 249-50 (1949).

It is well-established that the right to confront witnesses does not apply at a sentencing hearing; nor do rules prohibiting the admission of hearsay. *See, e.g., United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005)(Sotomayor, J.)(listing cases). Indeed, "[a]ny information may

be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998). Thus, at a sentencing hearing, the Government may present testimony through law enforcement witnesses regarding the substance of victims' statements, *see United States v. Perez*, 523 Fed. App'x. 842, 844 (2d Cir. 2013); witness interviews, *United States v. Martinez*, 413 F.3d at 241-42, evidence seized in violation of the Fourth Amendment, *see United States v. Tejeda*, 956 F.2d 1256, 1263 (2d Cir. 1992), "statements obtained in violation of *Miranda*, if otherwise voluntary," *see United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2005), and corroborated information from an unidentified source as long as the Government shows good cause for its refusal to reveal the source. *See United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989). Further, a sentencing court may rely on the Government's proffer, *United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir. 1987), and evidence from a hearing in which the defendant was neither present nor represented. *Carmona*, 873 F.2d at 574.

B. The 3553(a) Factors

The 3553(a) factors in this case strongly support a sentence within the advisory Guidelines' range.

1.    The Nature and Circumstances of the Offense.

Ramil Mansourov's conduct in this case is extremely serious.   Although he did not use violence, Mansourov used his skill as a doctor, and the access his medical license provided to Medicaid patients, to defraud Connecticut's Medicaid program of over $4.1 million dollars in a short two-year period from 2015 to 2016, and nearly $5,000,000 overall for the total charged period.

Notably, Connecticut's Medicaid program provides health care coverage to 756,000 low-

income state residents, more than one-third of Connecticut's children, nearly half of non-elderly adults with disabilities in Connecticut, and over two-thirds of Connecticut's nursing home residents. *See* https://www.cthealth.org/wp-content/uploads/2018/08/Medicaid-Georgetown-brief-fact-sheet-August-2018.pdf.     In stealing from Connecticut's Medicaid program, Mansourov stole from the neediest of Connecticut's residents.

Mansourov's rationale for stealing from Connecticut's Medicaid program is even more disquieting. As noted above, Mansourov used much of the stolen Medicaid funds to give money, overseas trips and luxury items to various girlfriends. In an effort to entice back a former girlfriend who had filed a stalking complaint against him on December 16, 2015 (Money Recipient #1), Mansourov promised the former girlfriend that he would "transfer everything he had into her name so that she and her family were financially set." PSR Second Addendum at 1. He spent over $200,000 of the health care fraud proceeds on other women. In short, Mansourov stole from Connecticut's neediest residents to satisfy nothing else but his own libido.

In a curious strategy, Mansourov uses his sentencing memorandum not to show remorse for his criminal conduct or to outline the manner in which he will repay the nearly $5,000,000 he stole, but to attack his ex-wife as the reason he committed the fraud. Thus, Mansourov argues that his "downward spiral" was due to the collapse of his "turbulent" marriage. Doc. 106 at 7. Mansourov continues that due to the nearly two years of "contentious litigation" and "legal bills in the hundreds of thousands of dollars," he became "emotionally unhinged." *Id.* at 8. Mansourov then asserts that "facing mounting legal bills, and the burden of making very substantial alimony and support payments, Dr. Mansourov began fraudulently billing Medicaid." *Id.* While the judgment of dissolution in October 2014 was contemporaneous with the acceleration of his Medicaid fraud – he had been committing Medicaid fraud since 2013, but not to the extent he did

in 2015 -- no other connection exists between the two; Mansourov's attempt to blame debts he owed to his ex-wife for his fraudulent billing of Medicaid, is nonsensical.

*First*, although the bulk of Mansourov's Medicaid fraud – approximately $3.88 million of it -- occurred in 2015 and 2016, Mansourov did not pay his ex-wife from the stolen funds. At the time of his divorce, according to Money Recipient #1, Mansourov filed a tax return denoting $500,000 annual income. Mansourov's ex-wife notes that he earned at least $300,000 at the time of their divorce. Thus, Mansourov had ample income to pay his child support and his alimony aside from the money he stole from Medicaid.

*Second*, a review of how Mansourov spent his ill-gotten gains demonstrates that his spending had nothing to do with his ex-wife or his children. While he did pay roughly $200,000 of the stolen funds in legal fees, some of those legal fees were related to his arrest for stalking his ex-girlfriend ("Money Recipient #1"). *See* Second Addendum to PSR at 1. And the amount of legal fees he paid from the stolen Medicaid funds pale in comparison to the amounts he spent on girlfriends, luxury items for himself and his girlfriends, and travel. In fact, Money Recipient #1 alone received over $530,000 of the $3.88 million Mansourov stole from Medicaid in 2015 and 2016. Thus, as discussed above, Mansourov's muse for his divorce was not his ex-wife, but his own carnality.

*Third*, the divorce had nothing to do with Mansourov's money laundering. Mansourov was not moving money to hide funds from his ex-wife – she had no idea that he was even stealing from Medicaid. Rather, Mansourov laundered his health care fraud proceeds to protect them from the State's Attorney General's Office. After all, Mansourov himself admits that he was confronted by Connecticut Department of Social Services investigators in July of 2015 for $900,000 in "dubious billings." Doc. 106 at 8. Mansourov's movement of funds from the accounts into which DSS paid

him (and from which they could ostensibly retrieve the misappropriated funds) into other accounts was simply an attempt to disguise his stolen money and to hide it from DSS investigators. These money movements had nothing to do with his ex-wife. Nor were the transfers between accounts – the layering -- the conduct of an "unhinged" man; to the contrary, the multiple layers were a rationally calculated attempt to ensure that the stolen funds remained within his control, albeit in a disguised fashion.

Thus, although Mansourov uses his sentencing memorandum to cast aspersions on his ex-wife, a review of the evidence demonstrates no connection between his divorce and his commission of health care fraud and money laundering. This Court should not tolerate Mansourov's attempt to pin blame for his crime on his ex-wife. Mansourov has only his greed and his lust to blame for his crime.

2. <u>History and Characteristics of Ramil Mansourov</u>

In addition to blaming his ex-wife for his criminal conduct, Mansourov also suggests that the downward spiral his ex-wife caused him to suffer was exacerbated due to his memory of his mother's suicide. See Doc. 106, 4-5 ("the loss of his mother through suicide produced a certain vulnerability that would set Dr. Mansourov into a tailspin when his second marriage disintegrated"). To be sure, Mansourov's mother's suicide must have been devastating to Mansourov as a child. But, according to the well-researched PSR, thereafter he was nonetheless able to graduate from medical school, serve in the United States Air Force, and earn enough to purchase an urgent health care clinic in Norwalk, Connnecticut. Mansourov himself informed the Probation Department that after his mother's suicide, he remained in a school for "academically talented students" and maintained his status as an "'A' student." PSR ¶ 76. At a minimum, Mansourov's mother's suicide did not divert him from his academic or professional pursuits. The Government is extremely skeptical that the

specter of his mother's suicide forty years earlier played any role in his scheme to defraud Connecticut's most vulnerable citizens of health care funds and his successful endeavor to hide any traces of the stolen funds by layering monetary transactions into various accounts within his control, both foreign and domestic.

In fact, and in marked contrast to Mansourov's recasting of his own history, even at the time he was caught, Mansourov exhibited not remorse but pride in his criminal conduct. While on the run from his arrest warrant in Canada, Mansourov sent a text message to Money Recipient #1: "I will always love you I believe everything I did was good for you. **Don't regret a second shifting money from government to you :)**" (emphasis added).

Nor was this prideful boasting about his crime an after-the-fact invention. To the contrary, it merely confirmed what Mansourov had said to Money Recipient #1 in an e-mail in 2015 – at the height of his health care fraud scheme and money laundering -- "he was going to transfer everything he had into her name so that she and her family were financially set." Second Addendum to the PSR at 1. Money Recipient #1 herself related to the DEA that when she became upset with Mansourov, he would ply her with even more money. Without a doubt, Mansourov's crimes had nothing to do with his ex-wife, his daughters, all of whom he had rejected for his infatuation with Money Recipient #1 and other women, or, for that matter, his mother's suicide. Mansourov knew exactly what he was doing, why he was committing crime, and had no regrets about defrauding a program that served the neediest in Connecticut's society while he lived in relative luxury in Darien on an annual salary of $300,000+.

Particularly galling is the manner in which Mansourov included his own daughters in his fraud. Instead, he obtained Connecticut Medicaid coverage for himself and his two daughters despite

earning over $300,000 per year, resulting in a loss to Medicaid of $13,000.[2]  Not surprisingly, Mansourov used fabrications about a negative income to "qualify" for such Medicaid coverage.  But the fact that he refused to even pay out-of-pocket for his daughters' medical treatment calls into question the judgment or knowledge of those who claim that he was a "loving and caring father to the girls," as does Mansourov's actions in depleting his daughters' CHET accounts.[3]  Doc. 106 at 6, 7.  Certainly, both actions cast a pall over his claim that "the two most important people in his life are his two daughters . . . ."  *Id.* at 13.  In fact, his spending of the health care fraud proceeds show that the two most important people in his life are himself and himself.

Mansourov also asks this Court to grant him a departure pursuant to U.S.S.G. § 5H1.11.  Doc. 106 at 15.  While it is within the Court's discretion to grant him a downward departure for reasons to include military service, *see United States v. Canova*, 412 F.3d 331, 357 (2d Cir. 2005), the Government respectfully submits that such a departure should not be awarded under the circumstances of this case.  U.S.S.G. § 5H1.11 states that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  In this case, Mansourov's victims were the neediest of Connecticut's residents – the poor, the disabled, the elderly, and children.  In light of Mansourov's complete lack of remorse – **Don't regret a second shifting money from government to you :)**

---

[2] The Government was not aware at the time of the plea agreement that Mansourov had used his daughters to commit health care fraud.  If it had known, it would have argued for a further two point upward adjustment in his offense level for Using a Minor to Commit a Crime, pursuant to U.S.S.G. § 3B1.4, which would have raised Mansourov's total offense level to 33, which when combined with a Criminal History Category I, would have yielded an advisory Guidelines range of 135-168 months' imprisonment.

[3] In light of Mansourov's sentencing memorandum, Goulnara Mansourov, through counsel, has noted that she was not interviewed for Mansourov's PSR.  She has asked, after consulting with her counsel, that a letter she wrote to the Government and which she says was sent to the Court be included in the record.  Because it contains facts not in the PSR, the Government is attaching it as Exhibit 1.

(emphasis added) -- to grant him a downward departure for *prior* public service when he has so unashamedly and unabashedly defrauded a program that serves the neediest members of the public would simply be perverse.

### 3.  The Court Should Consider General Deterrence

In the world of the stereotypical narcotics dealer, general deterrence had little utility. The allure of quick riches and flashy cars and jewelry often trounces the fear of a lengthy sentence to someone who cannot obtain a job to feed themselves or their family. But to practicing medical doctors, who fear losing their lucrative careers, their earnings, their reputations, and their status in society, a sentence in the advisory Guidelines range will have a significant impact. To be sure, Mansourov ignored the deterrent message of fellow medical practitioner John Katsetos's sentence of 87 months' imprisonment, no doubt because of Mansourov's arrogance and belief that he was above the law. However, for another doctor, who might lack Mansourov's arrogance but who still might be tempted to follow in Mansourov's footsteps, a lengthy sentence will send a strong message of deterrence.

### 4.  Just Punishment

Mansourov defrauded Medicaid up until the moment he realized the DEA had a warrant for his arrest. Despite withdrawing hundreds of thousands of dollars in cash, wiring monies to his own account in Switzerland and layering transactions, he has made no attempt to repay even a single cent of the money he stole from Connecticut's Medicaid Program. If the manner in which he has treated his daughters – qualifying them for Medicaid despite his substantial earnings and withdrawing the entirety of their college savings accounts – is any indication, Mansourov will never repay a single cent. Having not even reached the age of fifty years', on his release from federal prison -- no doubt with a significant reduction in sentence from his participation in the RDAP program due to his

claimed recurrence of alcoholism -- he will likely return to Russia or perhaps an "oil-rich" country in the Middle East as he whimsically planned during his flight from arrest, and practice medicine again.   There, he will begin his life anew and access the monies he stole and secreted, never repaying even a dime to Connecticut's Medicaid.  Mansourov is not deserving of a sentence below the advisory Guidelines as he requests.

CONCLUSION

Ramil Mansourov stands before this Court an arrogant man, who has no qualms about lying to the Court – he was never employed by the Houlton Hospital in Maine, as just one example.  He not only lied to steal from a program that serves Connecticut's neediest citizens, but also lied to steal from his own daughters' futures, all to satisfy his own libido and narcissism.  A sentence within the advisory Guidelines range will satisfy the purposes of punishment.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

RAHUL KALE
ASSISTANT U.S. ATTORNEY
United States Attorney-s Office
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
(203)696-3000
Federal Bar No. phv0256

<u>CERTIFICATION OF SERVICE</u>

       I hereby certify that on February 27, 2019 a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Courts CM/ECF System.

         /s/_____
        Rahul Kale
        Assistant United States Attorney